STATE of Wisconsin, Plaintiff-Respondent,

v.

Jody MAYO, Defendant-Appellant.

Court of Appeals

*No. 96–3656. Submitted on briefs October 2, 1997.—Decided February 26, 1998.*

(Also reported in 579 N.W.2d 768.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William E. Schmaal,* assistant state public defender, of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, with *William L. Gansner,* assistant attorney general.

Before Eich, C.J., Vergeront and Roggensack, JJ.

EICH, C.J.   Jody Mayo appeals from an order denying her motion for a new trial based on newly discovered evidence. She was convicted of murdering Randall Bleiler in Janesville in 1981. The purported "new" evidence consists of several statements her co-defendant, Michelle Lambert, made in 1990 that she alone had killed Bleiler and that Mayo had not been involved in the murder.

The State does not challenge the fact that Lambert made the statements. Nor does it dispute that four of the five criteria for granting a new trial on grounds of newly discovered evidence have been established in this case.[1] The question before us, then, concerns the

---

[1] Generally, in order to secure a new trial on grounds of newly discovered evidence, the defendant must prove, by clear

fifth criterion: whether the new evidence of Lambert's recent statements creates a reasonable likelihood that a new trial would produce a different result. This inquiry leads us to an ancillary issue: whether other newly discovered evidence corroborates the recantation of Lambert's prior testimony.

Because the legal standard applied by the trial court in assessing Mayo's motion is not the one announced by the supreme court in *State v. McCallum*, 208 Wis. 2d 463, 479, 561 N.W.2d 707, 713 (1997), and because, as the *McCallum* court recognized, a recantation inherently calls into question the credibility of the recanting witness or witnesses, we remand to the trial court—the same judge who presided over Mayo's trial—for redetermination of the issue under the proper standard.

Bleiler was beaten and stabbed to death in Janesville in June 1981. His body was found lying on a sofa in a blood-spattered room, and Lambert and Mayo, both of whom were acquainted with Bleiler, were charged with killing him. They were tried separately. Lambert, who was tried first and found guilty of being a party to Bleiler's murder, testified at Mayo's trial in 1984, emphatically denying that either she or Mayo was involved in the murder.[2]

---

and convincing evidence that: (1) the "new" evidence came to his or her knowledge after the trial; (2) he or she was not negligent in seeking to discover it; (3) the evidence is material to an issue in the case; (4) the evidence is not merely cumulative to evidence adduced at trial; and (5) the new evidence creates a reasonable probability that a different result would be reached at a new trial. *State v. Brunton*, 203 Wis. 2d 195, 200, 552 N.W.2d 452, 455 (Ct. App. 1996).

[2] Lambert was consistent and emphatic in her denials. When asked whether she had admitted killing Bleiler to any-

The prosecution's case against Mayo relied heavily on various witnesses who testified that Lambert had admitted killing Bleiler—sometimes implicating Mayo as well—and one or two witnesses who testified that Mayo said she had participated in the murder. Mayo did not testify at her trial. The jury found her guilty, and the trial court sentenced her to life in prison. We affirmed her conviction on direct appeal in an unpublished 1986 decision.

In April 1993, Mayo moved for a new trial on grounds of newly discovered evidence—Lambert's alleged statements to various employees of Taycheeda Correctional Institution on December 6, 1990, that she killed Bleiler and that Mayo played no part in the murder.

The trial court held a hearing on the motion and took testimony from several witnesses. Robert Owens, a psychologist at Taycheeda, where Lambert was serving her life sentence, had counseled her "very sporadically" over a two-year period. He testified that, on December 6, 1990, Lambert "burst in[to]" his office without an appointment and told him that Bleiler's murder was her "fault," that she "c[ould]n't live with the guilt any longer," and that Mayo "wasn't even there that night." According to Owens, Lambert did not offer any further details, but he overheard her making similar statements to an attorney she telephoned from Owens's office. Owens believed that Lambert was sin-

---

one, she responded: "I am denying it. Deny. Deny. Deny. Right down the line." And she testified that several witnesses who testified she had freely admitted her guilt to them had "mixed everything up." At another point in her testimony, when the prosecutor asked a series of ten questions concerning Lambert's and Mayo's involvement in Bleiler's murder, Lambert responded to each question: "I . . . deny it."

cere but also delusional at the time. Susan Lopau, an associate warden at Taycheeda, testified that on the same day she overheard Lambert "crying" and "yelling" in the hallway: "Jody didn't do it. Jody didn't do it." Lopau testified that she took Lambert into her office and Lambert telephoned an attorney, repeating to him: "Jody didn't do it. She wasn't even there." Lopau described Lambert as being "well-organized" and understandable during the encounter. A third witness, the prison chaplain, Marilyn Morris, testified that Lambert also came to her office on December 6, "crying" and "very distraught," stating that she, not Mayo, had killed Bleiler. As before, she offered no details about the crime other than Bleiler's name. Morris stated that in her opinion Lambert appeared "genuine" but was not behaving rationally.[3]

---

[3] A fourth witness, psychiatrist Darold Treffert, had treated Lambert at the prison for several years. He testified that Lambert told him in April 1986 that she was thinking about changing her plea to "[n]ot guilty by reason of insanity"—although in this and subsequent conversations, she continued to maintain her complete innocence, stating, "I want to clear my name, that I'm innocent." He stated that, in a conversation occurring several months later, in mid-December 1986, Lambert "talked somewhat differently, . . . acknowledging that she may have had something to do with . . . this whole thing, and that her mental state may have had something to do with it." Treffert could say only that he "had the impression that a somewhat different version than what she had been holding to would come out." Treffert also testified that, during this December 1986 conversation:

> [T]he thing that she talked about mostly that day . . . was that she had maintained with her family and other friends . . . that she was innocent. . . . And she was concerned if she now said she was going to enter an NGI plea the implication was that there was a different

Lambert refused to testify at Mayo's postconviction hearing, asserting her Fifth Amendment privilege against self-incrimination. And she persisted in this refusal after the trial court rejected her constitutional claim. Mayo testified that, while she was with Lambert earlier in the evening of Bleiler's murder, the two parted company and she went home and did not participate in the crime.

The trial court denied Mayo's motion for a new trial, concluding first that, in its opinion, it was not reasonably probable that a different result would be reached at a new trial:

> Now, this court has had an opportunity to observe the demeanor of Michelle Lambert as a witness.[4] I have observed the demeanor of those that she made the statements to.
>
> And I conclude that, based on everything that's been presented, . . . these statements lack circumstantial guarantees of trustworthiness such that this court should [not] put the state through the burden of another trial at taxpayers' expense.
>
> . . . I think the issue is: Is it reasonably probable that a different result would be reached at a new trial? And what I have here in terms of the total

version of events and that those people who had supported her would feel misled by her . . . .

According to Treffert, while Lambert suffered from schizoaffective schizophrenia, "it was well-controlled" that day and she seemed to understand the "upshot" of his questions. Finally, he stated that he did not recall Lambert indicating to him how the murder had occurred.

[4] Judge Lussow's remarks refer to Lambert's testimony at Mayo's 1984 trial, over which he presided. As indicated, Lambert refused to testify at the hearing on Mayo's motion for a new trial.

scheme suggests to me that the result would be the same.[5]

We agree with both Mayo and the State that one "genuine and dispositive" issue is before us: whether, considering the evidence of those statements, it is "reasonably probable that a different result would be reached [at] a new trial." *State v. Brunton*, 203 Wis. 2d 195, 200, 552 N.W.2d 452, 455 (Ct. App. 1996) (quoted source omitted). And it is Mayo's burden to " 'produce evidence of [a] clear, satisfactory and convincing nature that if [the] evidence were to be considered by a jury it would or could possibly lead to a different result.' " *State v. Avery*, 213 Wis. 2d 228, 237, 570 N.W.2d 573, 577 (Ct. App. 1997) (quoted source omitted).

In *McCallum*, the defendant had been convicted of sexually assaulting a child. The prosecution was based entirely on the testimony of the purported victim and, after the preliminary hearing, McCallum entered an *Alford* plea to the charge.[6] A year later, the victim recanted her accusations and McCallum moved to withdraw his plea based on this "newly discovered evi-

[5] Responding to a question from Mayo's counsel, the court went on to "find" that Lambert's statements, as recounted by the witnesses at the hearing, were not admissible "because they lack substantial guarantees of trustworthiness." For purposes of this appeal, the State assumes that the evidence was admissible, leaving as the sole and dispositive issue whether it is probable that a new trial would lead to a different result.

[6] The supreme court has defined an *Alford* plea as "a guilty plea in which the defendant pleads guilty while either maintaining his [or her] innocence or not admitting having committed the crime." *State v. Garcia*, 192 Wis. 2d 845, 856, 532 N.W.2d 111, 115 (1995). Wisconsin permits defendants to enter such pleas. *Id.*

dence." The victim testified at the hearing on McCallum's motion, stating that her testimony at the preliminary hearing was untrue, and that she had, for a variety of family-related reasons, falsely accused him of assaulting her. The trial court denied McCallum's motion, ruling that he had not established a reasonable probability of a different result on retrial because, in the court's view, the victim's recantation testimony was less credible than her original testimony accusing McCallum of the offense. The supreme court reversed, concluding that the trial court had used an improper standard in considering the issue. "The correct legal standard when applying the 'reasonable probability of a different outcome' criteria," said the court, "is whether there is a reasonable probability that a jury, looking at both the accusation and the recantation, would have a reasonable doubt as to the defendant's guilt." *McCallum*, 208 Wis. 2d at 474, 561 N.W.2d at 711.[7]

Paraphrasing *McCallum*, Mayo maintains that we must thus consider whether there is a reasonable probability that a jury, looking at both the evidence adduced at Mayo's trial and the "new" evidence of Lambert's statements admitting sole guilt for the crime, would have a reasonable doubt as to Mayo's guilt. We consider that to be the appropriate test in this case.[8]

---

[7] The court stated, "This standard is equally applicable to motions to withdraw an Alford plea, motions to withdraw a guilty plea, and motions for a new trial." *State v. McCallum*, 208 Wis. 2d 463, 474, 561 N.W.2d 707, 711 (1997).

[8] We said in *State v. Avery*, 213 Wis. 2d 228, 241 n.1, 570 N.W.2d 573, 579 (Ct. App. 1997), that the language in *McCallum* was "the equivalent of the conventional test for newly-discovered evidence . . . . [:] If there is a reasonable probability

225

■

There is another requirement in "recantation" cases, however: "[The] newly discovered recantation evidence must be corroborated by other newly discovered evidence." *Id.* at 476, 561 N.W.2d at 711. Because recantations involve an admission that the recanting witness has lied under oath, they are considered to be "inherently unreliable." *Id.* at 476, 561 N.W.2d at 712. According to the *McCallum* court:

> There is sound reason to adhere to the [corroboration] requirement. Recantations are inherently unreliable. The recanting witness is admitting that he or she has lied under oath. Either the original sworn testimony or the sworn recantation testimony is false. Because of the unreliability of recantations, we reaffirm the rule that recantation testimony must be corroborated by other newly discovered evidence.

*Id.* (citation omitted).[9]

---

that a jury would harbor a reasonable doubt as to guilt, it follows that there exists a reasonable probability of a different result."

[9] The concurring opinion in *McCallum* points out that courts "view recantation with great caution," and that the issue has "proved troublesome for federal and state courts" around the country. *McCallum,* 208 Wis. 2d at 481, 561 N.W.2d at 714 (Abrahamson, C.J., concurring). One commentator has noted:

> Courts are extremely distrustful of recantations . . . . In fact, it has been said that "[t]here is no less reliable form of proof." A widespread view of recantation is [that there] . . . "is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character."
>
> . . . .
>
> . . . When a witness substantially recants his or her previous testimony, it is immediately apparent that on one occasion or the

Mayo argues that this is not a "recantation" case because the recantation at issue does not involve "the testimony of an accuser." It is true that cases discussing recantations and the corroboration rule have involved the recantation of accusatory testimony by the victim of the offense—usually accusations of assault or sexual or child abuse—and that Lambert did not testify that Mayo had participated in Bleiler's murder. Rather, as indicated, she repeatedly and vehemently denied, under oath, that she or Mayo had anything whatever to do with the crime. Thus, while Lambert's recent unsworn statements to persons at the prison do not recant former accusations, since she never accused Mayo of the murder, they do constitute a direct and unequivocal recantation of her claim that she (Lambert) had absolutely nothing to do with the murder, and we think the corroboration rule is equally applicable in such a situation.

As we have said, the trial court concluded that, based on its own view of the credibility of Lambert's trial testimony and her later recantation, there was no reasonable probability of a different result at a new trial. We see that as the equivalent of the trial court's ruling in *McCallum* that the victim's recantation testimony was less credible than her original accusatory testimony—a ruling the supreme court reversed as

other, he or she told something other than the truth. An aura of suspicion is thereby cast on both statements of the witness. While the purpose, presumably, of the recantation is to call the validity of the original testimony into question, the effect is that the recanting testimony itself also becomes suspect.

Sharon Cobb, *Gary Dotson as Victim: The Legal Response to Recanting Testimony*, 35 EMORY L.J. 969, 981, 982 (1986) (quoted sources and citations omitted).

227

being based on "the wrong standard of law." *McCallum*, 208 Wis. 2d at 472, 561 N.W.2d at 710. The *McCallum* court stated that the proper standard is not whether the trial court believes the recantation to be more or less credible than the original testimony but "whether there is a reasonable probability that *a jury*, looking at both the [former testimony] and the recantation, would have a reasonable doubt as to the defendant's guilt." *Id.* at 474, 561 N.W.2d at 711 (emphasis added).

The *McCallum* court considered the corroboration requirement, that is, whether the newly discovered evidence indicated that: "(1) there is a feasible motive for the initial false statement; and (2) there are circumstantial guarantees of the trustworthiness of the recantation." *Id.* at 477–78, 561 N.W.2d at 712.[10] And while the court noted that it "could apply the proper legal standard to the facts" and determine whether McCallum's motion should be granted, the "wiser course" under the circumstances would be to have the circuit court make that determination. *Id.* at 479, 561 N.W.2d at 713. We think the court's reasoning is equally applicable here.

> Recantation, by its very nature, calls into question the credibility of the witness or witnesses. During the preliminary hearing, under oath, [the victim] accused McCallum of [having sexual contact with her]. During the post-conviction hearing, again under oath, she swore that her original sworn testimony was false. During at least one of these hearings, [the victim] lied under oath.
>
> [The victim]'s credibility is crucial to the application of the proper legal standard, and the circuit

---

[10] For additional discussion and application of the corroboration requirement, *see State v. Terrance J.W.*, 202 Wis. 2d 496, 502–04, 550 N.W.2d 445, 448 (Ct. App. 1996).

228

court judge is in a much better position to resolve the question of whether the recantation would raise a reasonable doubt in the minds of a jury that is looking at both the recantation and the original statement.

This court is bound by the cold, appellate record. We have read and reread the testimony of [the victim] and her mother. Nonetheless, our consideration is limited to the written word and rarely can credibility be judged by words alone. More often, credibility, or lack thereof, is revealed by a close examination of the witness's demeanor. The cold record does not reflect the witness's demeanor and all its facets; the circuit court has the advantage of observing them.

Because the circuit court is in a better position to determine whether a reasonable probability exists that a reasonable jury looking at both the recantation and the original [testimony] would have a reasonable doubt as to McCallum's guilt, we defer this determination to the circuit court. . . . to apply the proper legal standard . . . .

*Id.* at 479–80, 561 N.W.2d at 713.

While differences exist between this case and *McCallum*—notably that Lambert's "recantation," unlike her trial testimony, was not under oath—questions of credibility still permeate the *McCallum* "different result" test. And while Lambert's recantation was not made in testimony taken before Judge Lussow, he had the opportunity to observe her testimony at the earlier trial, as well as the testimony of the witnesses describing her later statements.

■

We therefore reverse the order denying Mayo's new-trial motion and remand the matter to the circuit court for the purpose of determining: (1) whether Lam-

bert's recantation of the testimony she gave at Mayo's trial was corroborated by newly discovered evidence, as that requirement is discussed in *McCallum*; and, if so, (2) whether there is a reasonable probability that a jury, considering both Lambert's trial testimony and her later statements recanting that testimony, would have a reasonable doubt as to Mayo's guilt.[11]

*By the Court.*—Order reversed and cause remanded with directions.

---

[11] The trial court may, in its discretion, hold a hearing in this regard, or it may decide the issue on the present record.